UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL A. MARIANETTI,

                          Plaintiff                    DECISION AND ORDER

-vs-


                                                       17-CV-6748 CJS

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                          Defendant.
_____


APPEARANCES

For the Plaintiff:          Ida M. Comerford
                            Kenneth R. Hiller
                            6000 North Bailey Avenue, Suite 1A
                            Amherst, New York 14226

For the Defendant:          Haseeb Fatmi
                            Michael A. Thomas
                            Sixtina Fernandez
                            Social Security Administration
                            Office of General Counsel
                            26 Federal Plaza, Room 3904
                            New York, New York 10278

                            Kathryn L. Smith, A.U.S.A.
                            Office of the United States Attorney
                            for the Western District of New York
                            100 State Street
                            Rochester, New York 14614


INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Michael Marianetti ("Plaintiff") for Social Security

Disability Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). Now

before the Court are Plaintiff's motion (Docket No. [#8]) for judgment on the pleadings

and Defendant's cross-motion (Docket No. [#11]) for judgment on the pleadings.

Plaintiff's application is granted, Defendant's application is denied and this matter is

remanded for further administrative proceedings.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the Parties' motions, which contain

recitations of the pertinent facts. The Court has reviewed the administrative record [#7]

and will reference it only as necessary to explain this Decision and Order.

Plaintiff claims to be disabled primarily due to injuries that he sustained in a

motor vehicle accident many years ago,[1] which left him with without the use of his left

arm. Plaintiff apparently sustained significant nerve damage to his left brachial plexus,

with resulting chronic pain. The medical record in this action begins in May 2013, many

years after Plaintiff's accident.

On May 23, 2013, Plaintiff went to family medicine practitioner Scott Hartman,

M.D. ("Hartman"), seeking to establish a new treating relationship, purportedly after not

having seen a doctor "for a few years." (T. 8). At that time, Plaintiff was thirty years of

age. (T. 8). Plaintiff indicated that he had been in a motor vehicle accident ("MVA") at

age nineteen and had suffered significant injuries to his left arm and shoulder, as well

---

[1] The record is entirely unclear as to when this occurred, as Plaintiff has reportedly indicated variously that he was thirteen, fourteen, sixteen and nineteen at the time of the accident. (T. 8, 19, 25, 39, 103, 426, 440).

as a subdural hematoma. Plaintiff indicated that he might have suffered some "learning difficulties and possible mild depression" as a result of the subdural hematoma, but Hartman observed no symptoms of depression. (T. 8). Regarding the shoulder injury, Plaintiff reported chronic left shoulder pain and "nerve dysfunction." Upon examination, Hartman noted that Plaintiff had several surgical scars in the left shoulder area, as well as decreased strength and muscle atrophy. (T. 9). Hartman referred Plaintiff to "orthopedics and neurosurgery for eval[uation] and [treatment]." (T. 9). Plaintiff did not complain of any problems with his lower back.

On June 24, 2013, Plaintiff returned to Hartman's office, complaining that his depression was worse. (T. 11). Again, Plaintiff did not complain of any problems with his back. Hartman noted that Plaintiff had not yet been scheduled to see an orthopedic specialist or neurologist for his shoulder problems. (T. 11). Hartman referred Plaintiff to a psychiatrist or psychologist for his depression. (T. 11). Hartman further noted that Plaintiff planned to return to the office within 3-4 weeks because he wanted Hartman to complete "some disability paperwork." (T. 11).

On July 23, 2013, Plaintiff returned to Hartman's office, with the aforementioned disability paperwork. (T. 430-436). Plaintiff apparently was still waiting to see a neurologist or orthopedic specialist. (T. 14). During the visit with Hartman, Plaintiff complained that he was having pain in his lower back, which he attributed to having "lifted garbage" the previous week. (T. 13). Plaintiff also indicated that his "pain and dysfunction" from his shoulder injury had worsened. (T. 13). Hartman performed a physical exam and noted that Plaintiff's shoulder symptoms were unchanged. (T. 13). Regarding Plaintiff's back, Hartman found some "lumbar paraspinal muscle spasm," but

results of the straight leg raising test were negative, and Plaintiff had normal deep tendon reflexes in both legs. (T. 13). Hartman prescribed cyclobenzaprine and naproxen for pain and directed Plaintiff to follow up in two weeks. (T. 13).

That same day, Hartman completed a "cervical spine impairment questionnaire" (T. 430-436). After noting that he had been treating plaintiff for two months, Hartman indicated that Plaintiff's conditions were "brachial plexus injury, [left] should pain, chronic back pain [and] depression." (T. 430). In pertinent part, Hartman's report offered the following opinions: Plaintiff had no use of his left arm, but full use of his right arm (T. 430); Plaintiff had muscle spasms in his left shoulder and "lower back" (T. 431); Plaintiff's conditions were supported by "MRI reports," which reportedly had been performed at Rochester General Hospital, but which Hartman did not have (T. 431) ("I do not have"); Plaintiff had pain "daily, all day" (T. 432); Plaintiff could not perform full time work (T. 433); in a work situation, Plaintiff could sit for two hours per day, stand/walk for two hours per day, lift up to ten pounds occasionally, should not sit continuously, and should take a ten minute break every hour (T. 433); Plaintiff's pain would "constantly" interfere with his attention and concentration (T. 434); Plaintiff was only capable of "low stress" work (T. 434); Plaintiff would need to take a fifteen minute break every two hours (T. 435); Plaintiff would miss work more than three times per month (T.436); and Plaintiff should avoid pushing, pulling, kneeling, bending and stooping (T. 436). Hartman indicated that he did not know when Plaintiff's symptoms began, since he did not have his medical records. Nevertheless, based upon Plaintiff's statements, Hartman indicated that Plaintiff's problems likely began at age 19, since that was when he allegedly was injured. (T. 436) ("Unsure – I don't have records. Likely

4

since 19 yo").

On August 22, 2013, Plaintiff returned to Hartman's office, stating that he had been to see an unnamed neurologist, who had ordered a CT scan of the lumbar spine and referred him to physical therapy. (T. 16). Plaintiff reportedly indicated that his left shoulder symptoms were stable, but were causing him difficulty with "completing work tasks" (T. 16). This reference to "work tasks" is puzzling because Plaintiff claims he stopped working in in June 2013. (T. 85). Hartman continued to list "lower back pain" as one of Plaintiff's ailments, but did not make any findings regarding that condition. (T. 17).

On September 11, 2013, Plaintiff filed an application for SSDI and SSI benefits. (T. 141).

On September 19, 2013, Plaintiff returned to Hartman's office, "present[ing] for back pain." (T. 19). Plaintiff was seen by Carolyn Braddock, NP ("Braddock"), who reported that Plaintiff "was hit by a car when age 16 [and] suffered clavicle fracture and brachial plexus injury," resulting in "little use of [the] left arm." (T. 19). Plaintiff complained of pain in his lower back and mid-thoracic back, which, along with scoliosis, he felt was affecting his posture. (T. 19). Braddock noted, "Had CT of spine recently – some bulging discs." (T. 20).

On October 29, 2013, Plaintiff returned to Hartman's office. (T. 39). Plaintiff indicated that his shoulder pain seemed worse with cold weather, but otherwise his condition was the same. (T. 38). Hartman completed another disability report, entitled "Spinal Impairment Questionnaire," which stated in pertinent part the following: Plaintiff's diagnosis was "brachial plexus injury, chronic shoulder pain" (T. 422); Plaintiff had

tenderness and muscle spasm of the cervical and lumbar spines, but no trigger points or positive straight leg raising (T. 423); the diagnosis was supported by "MRIs[2] [and] x-rays" (though there is no indication that Hartman had these test results) (T. 424); Plaintiff had "stabbing" pain in his "lower back, upper back [and] left upper ext[remity]," "daily 10x daily" (T. 424);  the pain was precipitated by "motion, lifting, bending [and] cold weather" (T. 425); in a work setting Plaintiff could sit for one hour per day, stand/walk for two hours per day, [and] should not sit continuously; Plaintiff should "get up and move around" for fifteen minutes each hours (T. 425); Plaintiff can occasionally lift up to ten pounds (T. 425); Plaintiff's pain "constantly" interferes with his attention and concentration (T. 426); Plaintiff has "uncontrolled" pain (T. 427); Plaintiff is not able to work (T. 427); Plaintiff would miss more than three days of work per month (T. 427); and Plaintiff should avoid pushing, pulling, kneeling, bending and stooping (T. 428).

On November 12, 2013, Plaintiff returned to Hartman's office, indicating that his pain was stable, but that the was having "difficulty working since his work involves lifting." (T. 41).  Again, this reference to work is puzzling, since Plaintiff claims that he stopped working completely in June 2013.[3]  Hartman noted that Plaintiff was "[c]urrently completing disability paperwork." (T. 41).  Hartman apparently examined Plaintiff, but there is no mention of any abnormal findings (T. 42).

On November 25, 2013, Plaintiff underwent an internal medicine examination at the Commissioner's request, performed by Karl Eurenius, M.D. ("Eurenius").  Plaintiff

---

[2] This reference to MRIs is confusing, as Plaintiff reportedly told Eurenius that he could not have MRI testing, "due to hardware" (T. 413), which the Court understands to be a reference to orthopedic hardware in Plaintiff's body.

[3] Hearing Transcript (T. 109) ("ALJ: Have you worked at all since June of 2013?  Claimant:  No, your honor.").

reportedly told Euerenius about his motor vehicle accident and his resulting problems with his left shoulder and with concentration and memory. (T. 413). Plaintiff further stated that he had "developed low back pain" "over the years," which he described as "aching pain in the lower mid back made much worse by increasing cold." (T. 413). Plaintiff told Eurenius that he was able to perform all of his own self-care, including cleaning, laundry, shopping and cooking, and that he cared for his daughter between three and five times per week. (T. 414). Plaintiff indicated that he typically spent his time with his daughter, socializing with friends, watching television and playing online games. (T. 414). Eurenius noted that Plaintiff had recently had a CT scan, stating, "CT scan in 08/13 showed a lateral deformity of his neck." (T. 413).

Upon examination, Eurenius noted, in addition to the undisputed problems with Plaintiff's left arm and shoulder, that Plaintiff's gait was "slow, but balanced," and that he had difficulty walking on toes due to poor balance and low back pain." (T. 414). Eurenius stated that Plaintiff could not rotate his neck to the left "due to weakness," and had "significant tenderness and pain in the low mid back," and positive straight leg raising tests bilaterally. (T. 415). Eurenius further stated that "passive flexion of the hips causes pain in the low mid back." (T. 415). Eurenius's diagnosis was "chronic and severe left upper extremity weakness and pain extending in the left neck with limitation of motion of left neck"; "probable scoliosis of the neck, per the claimant, with atrophy and weakness of the left upper extremity; and "chronic low back pain with neuropathic symptoms." (T. 416). Eurenius's "medical source statement" was as follows:

> In my opinion, he is markedly limited in lifting, carrying, reaching, or handling objects due to a weak, painful left upper extremity. He is moderately limited in

bending, lifting, carrying, pushing, pulling, and climbing due to chronic low back pain with neuropathic symptoms.

(T. 416).

On November 29, 2013, agency review physician S. Putcha, M.D. ("Putcha") prepared a disability determination explanation, concerning Plaintiff's claim that he was disabled due to "spinal stenosis," "cervical spine impairment," "lumbar spine impairment" and "severe back pain." (T. 143). It appears that Putcha based the opinion on Eurenius's report, and on Hartman's and Paddock's office notes. (T. 144). Putcha also referred to CT scan results showing "bulging discs" and a "later[al] deformity of the neck." (T. 148). Putcha found that Plaintiff had a "severe" impairment, consisting of "spine disorders." (T. 146). Putcha opined that Plaintiff was limited in using his left hand and arm, with regard to reaching, handling, fingering and feeling. (T. 148). Putcha opined that Plaintiff could perform light work that required only the use of one arm, and that he could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (T. 147). Putcha further stated that Plaintiff had postural limitations related to low back pain, and could therefore only occasionally climb stairs, balance, stoop, kneel, crouch and crawl. (T. 147).

On January 6, 2014, Plaintiff was seen by orthopedic specialist Todd Stein, M.D. ("Stein"). Stein noted that Plaintiff had made only a "limited recovery" from his shoulder injury, with "significant shoulder atrophy" and only "some range of motion of the elbow." (T. 440). Plaintiff reportedly told Stein that he had "been noticing some pain in and around his back and ribs," "some" of which Stein speculated may have been due to

Plaintiff having "intercostal nerve transfers." (T. 440). Stein noted that Plaintiff had "significant atrophy of [the] deltoid," and his diagnosis was "injury of multiple nerves of shoulder girdle and upper limb NOS." (T. 441). Stein opined that there was nothing that he could do surgically for Plaintiff. (T. 441). Stein did not offer any opinions concerning Plaintiff's ability to perform any particular activities. (T. 441).

On January 16, 2014, Plaintiff was examined by neurologist Christina Taddeo, M.D. ("Taddeo"), concerning "complaints of neck and back pain with a left brachial plexus injury." (T. 437). Plaintiff reportedly told Taddeo that ever since his injury, he had "constant pain in the left upper limb," which was "getting progressively worse over the last 4-5 years." (T. 437). Plaintiff also mentioned "intermittent" lower back pain, which became "worse with any prolonged sitting or lying down, certain twisting motions or bending." (T. 437). Upon examination, Taddeo reported that Plaintiff had "significant atrophy throughout the entire shoulder girdle and left upper limb," tenderness and a tilting to the right of the cervical spine, tenderness and scoliosis in the thoracic spine, and tenderness in the lumbar spine. (T. 438). Seated straight-leg-raising tests were negative bilaterally. (T. 438). Taddeo noted that a CT scan taken on August 29, 2003, had shown "chronic bilateral pars interarticularis defects at L5-S1," "associated minimal grade 1 L5 on S1 anteriorolisthesis," and "diffuse posterior disc bulges at L4-5 and L5-S1 with no significant spinal canal stenosis or neural foraminal stenosis." (T. 438).

Taddeo's overall impression was

> persisting neuropathic pain, weakness and paresthesias in the left upper limb
> along with decreased function of the arm. He also has thoracic scoliosis and
> hypersensitivity issues in his back along with low back pain which I feel is
> mechanical in nature, although he has some lumbar spondylosis and spondylosis

at L5 bilaterally with spondylolisthesis of L5 on S1 as seen on CT.

(T. 439). Taddeo opined that additional therapy would not likely help with Plaintiff's left shoulder, but that "additional physical therapy for his back would be in order especially of the upper back as I feel he may have some neurological weakness of the back muscles that is contributing to his scoliosis along with back pain symptoms." (T. 439). However, Taddeo indicated that she wanted to get new x-rays of the neck and thoracic spine before ordering physical therapy. Taddeo provided Plaintiff with a prescription for the x-rays and stated that she would follow up with him to review the results and further discuss physical therapy. (T. 439). As noted below, though, it does not appear that Plaintiff ever followed through in obtaining such x-rays. (T. 60).

On January 28, 2014, Plaintiff returned to Hartman's office, "for shoulder pain." (T. 56). Plaintiff reportedly indicated that he had seen a "neurologist," presumably referring to Dr. Taddeo. (T. 56).[4] Hartman apparently examined Plaintiff, but there is no mention of any abnormal findings (T. 56-57).

On August 4, 2014, Plaintiff returned to Hartman's office, complaining about an insect bite. (T. 59). Hartman noted that Plaintiff had been to see Dr. Taddeo, and that he had reviewed Dr. Taddeo's "results & consult letters" with Plaintiff. (T. 59). Hartman noted, however, that Plaintiff "decline[d] further ortho/neuro/PT referrals at this time." (T. 60). Hartman apparently examined Plaintiff, but there is no mention of any abnormal

---

[4]Hartman did not mention having received any report from Dr. Taddeo, although the record indicates that Taddeo sent her report to Hartman on or about January 23, 2014.. However, as can be seen below, Hartman discussed Taddeo's report as part of his office notes for Plaintiff's visit on August 4, 2014. Accordingly, the Court assumes that when Hartman saw Plaintiff on January 28, 2014, he had not yet received or reviewed Taddeo's report.

findings.  Hartman reported that Plaintiff's shoulder pain was "chronic but stable." (T. 60).

On September 16, 2014, Plaintiff returned to Hartman's office, stating that his pain was "stable," and that he was not taking any medications.  Plaintiff also reiterated that he was not interested in further appointments with specialists. (T. 66) ("Since MVA 19 yo – chronic LUE muscle atrophy, shoulder pain, tried PT & neuro f/u last year but now not taking any meds & declines f/u with specialist.  Pain is stable but unable to work [secondary to] pain and muscle atrophy."). Hartman apparently examined Plaintiff, but there is no mention of any abnormal findings or of any lower back symptoms. (T. 66-67).

On March 31, 2015, Plaintiff returned to Hartman's office, concerning a cough, smoking cessation and depression. (T. 74).

On November 12, 2015, Plaintiff returned to Hartman's office concerning depression and "chest pain." (T. 77).  Hartman reported that there were "no new issues" related to Plaintiff's brachial plexus syndrome. (T. 77).  Hartman apparently examined Plaintiff, but there is no mention of any abnormal findings or of any lower back symptoms. (T. 77-78).

On March 21, 2016, Hartman completed two additional disability questionnaires for Plaintiff. (T. 442-449).  In the first report, entitled "Summary Impairment Questionnaire," Hartman stated that his diagnosis was "[left] brachial plexus [disorder] + [left] shoulder pain, chronic back pain, depression." (T. 442).  When asked to state what

"clinical and laboratory findings" supported that diagnosis, Hartman wrote, "MRIs[5] + x-ray reports [illegible] from other files." (T. 442). Regarding Plaintiff's abilities, Hartman stated, in pertinent part, that Plaintiff could sit for only 2 hours during an 8-hour workday, stand/walk for 2 hours during an 8-hour workday, lift/carry up to 5 pounds frequently, lift/carry up to 10 pounds occasionally, had essentially no use of his left hand or arm and would miss more than three days of work per month. (T. 443). In the second questionnaire, entitled "Spinal Impairment Questionnaire," Hartman stated his diagnosis as "brachial plexus injury, head trauma subdural hematoma,[6] brachial plexopathy (T. 444), and described Plaintiff's pain as "chronic, sharp, stabbing" pain in the "whole left upper extremity", "radiating to [the] hand" on a "daily/constant" basis. (T. 444). Regarding Plaintiff's abilities, Hartman stated that Plaintiff could sit, stand and/ or walk each for less than 1 hour during an 8-hour workday, could not lift or carry *any* amount of weight at all, could not sit continuously, would need to get up and move around every 30 minutes, and was unable to "ambulate effectively," and was therefore unable to walk a block, use public transportation, perform shopping or banking, or climb a few stairs. (T. 447). Further, Hartman stated that Plaintiff could not use *either* of his hands to grasp, reach or manipulate, would need to take breaks every hour for 10 minutes, would have worse pain in a work environment and would miss more than three days of work per month. (T. 448-449).

---

[5] Again, this reference to MRIs is puzzling, as Plaintiff stated that he could not have such testing.
[6] As far as the Court is aware, the only evidence of such an injury in the record is Plaintiff's self report.

On March 22, 2016, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff appeared with his representative. Regarding back pain, Plaintiff testified as follows:

> ALJ: And so is – is the pain in your low back?
>
> Plaintiff: A majority is actually in my neck. The – the constant pain is always in my – my arm and neck. But the back pain is – it – it gets – it's kind of – it's a daily thing, depending on if I move around too much or if I'm not moving around too much.

(T. 121). Plaintiff indicated that although he had constant pain in his neck and shoulder, it was worse in the winter months due to the cold temperatures. (T. 126). The ALJ took testimony from a vocational expert ("VE"), who indicated that Plaintiff's only past relevant work was as a security guard, which Plaintiff could not presently perform. The VE further testified, in response to the ALJ's question, that for someone with Plaintiff's age, education and employment history, who had use of only one arm, there was only one unskilled job available at any exertional level, namely, surveillance system monitor, DOT #279.367-010, which is classified as sedentary unskilled. (T. 116). The ALJ then asked the VE whether someone of Plaintiff's age, education and work experience, with use of only his dominant arm, who could perform light work but who could only sit for six hours and walk/stand for six hours, could perform any jobs in the national economy, and the VE indicated that such a person could perform the surveillance system monitor job. (T. 129).

Regarding the adequacy of the record, at the hearing Plaintiff's representative initially indicated that the record was complete. (T. 105). However, the ALJ pointed out that Dr. Hartman's office notes seemed to be missing, and left the record open for an

additional two weeks for Plaintiff's representative to obtain them. The attorney apparently did so, since the record now contains Hartman's office notes. (T. 108, 137, 139).

On July 7, 2016, the ALJ issued a Decision, denying Plaintiff's claim for SSDI and SSI benefits. (T. 83-94). As part of the ruling, the ALJ found, at the second step of the familiar five-step sequential analysis[7] used to evaluate such claims, that Plaintiff had two severe impairments: "brachial plexus disorder and left shoulder nerve dysfunction." (T. 85). The ALJ concluded, however, that Plaintiff's depression and "back pain" were not severe impairments. Specifically, as to the back pain, the ALJ indicated that the condition was "not medically determinable," stating:

> The record is devoid of any subjective [sic] evidence such as MRIs or x-rays demonstrating the existence of a medically determinable back impairment. Moreover, treatment notes indicated that to the extent that the claimant experienced back pain, it was mechanical in nature.

(T. 87). At step three of the analysis, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment. (T. 87-88).

Prior to reaching step four of the sequential analysis, the ALJ found that Plaintiff had the residual functional capacity

---

[7] "A five-step sequential analysis is used to evaluate disability claims. See 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in ... the regulations.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five." *Colvin v. Berryhill*, No. 17-1438-CV, 734 Fed. Appx. 756, 758, 2018 WL 2277791, at *1 (2d Cir. May 18, 2018) (citations and internal quotation marks omitted).

to perform light work as defined in 20 CFR 404.1567(b)[8] and 416.967(b) except that the claimant can sit for six hours in an eight-hour workday and stand and walk for six hours in an eight-hour workday. In addition, the claimant cannot lift or carry with the left non-dominant arm or use the left non-dominant arm to assist lifting and carrying.

(T. 88). In making this RFC finding, the ALJ reviewed the evidence concerning Plaintiff's activities of daily living (T. 88-89). The ALJ also discussed the various medical opinions and the weight that he was assigning them. (T. 89-92).

Most notably, the ALJ reviewed the questionnaires and reports completed by Dr. Hartman, on July 23, 2013, October 29, 2013 and March 21, 2016. The ALJ observed that those reports were not entirely consistent. The ALJ stated, for example, that in Hartman's first two reports (July 23, 2013 and October 29, 2013), he indicated that Plaintiff only had problems with his left arm, while in his March 21, 2016 report, he inexplicably stated that Plaintiff should "never" or "rarely" use *either hand* to perform grasping, reaching or fine manipulation. (T. 448). Similarly, the ALJ noted that in Hartman's first two reports, he indicated that Plaintiff's pain would "constantly" interfere with his ability to pay attention and concentrate (T. 426, 434), while in his report dated March 21, 2016, he stated that such pain would only "rarely" interfere with Plaintiff's ability to pay attention and concentrate. (T. 448).

---

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

The ALJ assigned "some" or "limited" weight to the portions of Hartman's reports dealing with Plaintiff's left shoulder limitations. However, the ALJ assigned "little weight" to the portions of Hartman's reports relating to Plaintiff's back pain, or which recommended limitations on sitting, standing/walking, postural limitations, the need for frequent breaks and the likelihood of Plaintiff missing days from work. In that regard, the ALJ found that such opinions were not supported by Hartman's treatment notes. For example, regarding the July 23, 2013 report, the ALJ stated:

> I accord little weight to the sit, stand and walk limitations, as Dr. Hartman's treatment records indicate that the claimant's limitations are associated with his left upper extremity and not his ability to sit stand and/or walk. Moreover, there is no evidence in Dr. Hartman's treatment notes that would support an inability to perform postural maneuvers or the need for frequent unscheduled breaks and absences.

(T. 89). The ALJ made essentially the same comment with regard to Hartman's report dated October 29, 2013. (T. 90). Further, as to Hartman's report dated March 21, 2016, the ALJ stated in pertinent part:

> I accord little weight to the sit, stand and walk limitations, as Dr. Hartman's treatment records once again, indicate that the claimant's limitations are associated with his left upper extremity only. Lastly, there is no evidence in Dr. Hartman's treatment notes that would support a need for frequent unscheduled breaks and absences.

(T. 92).

The ALJ similarly gave "little weight" to the portion of Dr. Eurenius's opinion that concerned Plaintiff's back pain, stating: "I accord little weight to the opinion regarding the claimant's back pain as the record does not establish or support a medically determinable back impairment. Nevertheless, his opinion is ultimately consistent with

the residual functional capacity [determination]." (T. 90).

Although Dr. Taddeo did not express an opinion concerning Plaintiff's functional limitations, the ALJ discussed her consultation letter, stating:

> [Dr. Taddeo found that claimant] had some muscle sensitivity, tenderness and reduced range of motion in the lumbar spine. Of significance, Dr. Taddeo noted that the claimant's back pain was only mechanical in nature and [s]he recommended physical therapy. However, the record is devoid of any *updated* imaging of the claimant's back or evidence that he attended physical therapy after his consultation with Dr. Taddeo.

(T. 91) (emphasis added). The Court interprets the ALJ's reference to a lack of "updated" imaging to mean that he was aware of Dr. Taddeo's reference to a CT scan that was performed in 2003, which showed degenerative changes as discussed earlier. (T. 438).

At step four of the sequential evaluation, the ALJ found that Plaintiff cannot perform his past relevant work. (T. 93). However, at step five, the ALJ found that Plaintiff could perform the job of surveillance system monitor and was therefore not disabled. (T. 94). Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision. (T. 1-3).

On October 31, 2017, Plaintiff commenced this action. On June 18, 2018, Plaintiff filed the subject motion [#8] for judgment on the pleadings, which alleges that the ALJ erred in three main respects. First, Plaintiff contends that the ALJ erred by failing to include his back pain as a severe impairment, or, alternatively, by failing to expressly include any limitations relating to such condition in the RFC finding, even if

the impairment was not severe.[9]  Further, Plaintiff maintains that the ALJ erred by giving "great weight" to the opinion of non-treating, non-examining agency review physician Dr. Putcha, since the opinion was based on an incomplete record and was inconsistent with the opinions of the treating physicians.  And finally, Plaintiff alleges that the ALJ failed to apply the treating physician rule, because he did not give the necessary "good reasons" for rejecting or partially-rejecting the opinions of the treating physicians, particularly the opinions of Dr. Hartman.

On July 30, 2018, Defendant filed the subject cross-motion [#11] for judgment on the pleadings.  Defendant maintains that the ALJ did not err by finding that Plaintiff's back pain was a non-severe impairment, since there was only "scant evidence" of a back impairment, such as muscle spasm, tenderness, positive straight-leg-raising tests and limited range of motion.  Defendant admits that there was also evidence of a CT scan showing degenerative changes such as "chronic pars defects," "disc bulges" and "minimal anterolisthesis," but suggests that the ALJ properly dismissed such results since the test had been performed "almost 10 years prior to the period at issue here."[10] Defendant contends that any error in that regard was harmless anyway, since the ALJ's RFC finding, limiting Plaintiff to light work, would have included any limitations flowing from Plaintiff's back impairment.  Defendant further maintains that the ALJ properly evaluated the medical opinion evidence and gave greater weight to the opinion of Dr.

---

[9] As the ALJ noted in his decision (T. 84), when making an RFC determination ALJs are required to consider all of the claimant's impairments, including those that are not severe. *See, Parker-Grose v. Astrue*, 462 F. App'x 16, 18, 2012 WL 29319 at *2 (2d Cir. Jan. 6, 2012)  ("A RFC determination must account for limitations imposed by both severe and nonsevere impairments.") (citing 20 C.F.R. § 404.1545(a)(2))

[10] Def. Memo of Law [#11-1] at p. 11.

Putcha than to the opinions of Dr. Hartman.

On August 20, 2018, Plaintiff filed a reply brief [#12].  On November 8, 2018, the Court heard oral argument.

Having thoroughly considered the parties' submissions and arguments, the Court finds that this matter must be remanded for further administrative proceedings for the reasons stated below.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

"Medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b) (Westlaw 2018).

DISCUSSION

Plaintiff contends that the ALJ erred when he found that Plaintiff's back impairment was not supported by medical signs and laboratory findings, and was therefore not severe. The Court agrees that the ALJ erred in that regard, since Plaintiff's back impairment is supported by medical signs and laboratory findings in the record.[11] As to this point,

> [o]bjective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption.

20 C.F.R. § 404.1529 (Westlaw 2018). As Defendant admits, Plaintiff's back impairment is supported by findings of muscle spasm, tenderness, reduced joint motion and positive straight-leg-raising tests.

Plaintiff's back impairment was also supported by references to a CT scan, showing degenerative changes in the spine, by Drs. Hartman, Taddeo, Eurenius and Putcha. See, *Francisco v. Comm'r of Soc. Sec.*, No. 13CV1486 TPG DF, 2015 WL 5316353, at *14 (S.D.N.Y. Sept. 11, 2015) ("[T]he medical evidence before the ALJ did contain references to positive X-ray findings and a medical diagnosis of sarcoidosis that had been made prior to December 31, 2007[.] . . . [T] he fact that Plaintiff had presented with symptoms that led his medical providers to perform tests and to

---

[11] The Court also agrees with Plaintiff that the ALJ erred insofar as he construed Dr. Taddeo's reference to Plaintiff's low back pain as "mechanical in nature" to mean that the condition was not severe. Rather, it appears that Dr. Taddeo used that term only to indicate a cause other than spondylosis, spondylolysis or spondylolisthesis. (T. 439) (Taddeo indicated her belief that the pain was "mechanical in nature," *although* he has some lumbar spondylosis and spondylolysis at L5 bilaterally with spondylolisthesis of L5 on S1." (T. 439) (emphasis added).

conclude that he suffered from a medical condition causing those ongoing symptoms suggests that the ALJ was incorrect in stating that "there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through the date last insured.").

Unfortunately, additional information concerning this CT scan is missing, though the Court believes that it should have been obtained and made a part of the record.[12] Notably, both parties seem to be working under the assumption that the CT scan was performed in 2003, some ten years prior to the events at issue in this action. This is understandable, due to the reference in Dr. Taddeo's report to the CT scan having been performed on "8/29/2003." (T. 438). However, the Court is confident that date was a typographical error, for several reasons. First, it is unlikely that Dr. Taddeo would have relied on a ten-year-old CT scan of the lumbar spine in making her assessment, particularly when, as part of the same report, she requested new diagnostic testing of the neck and thoracic spine. (T. 439). More importantly, Dr. Hartman's office note dated August 22, 2013, states, "Pt saw neurology, order CT of l-spine" (T. 16), and NP Braddock's subsequent office note, dated September 19, 2013, states: "Had CT of spine *recently* – some bulging discs." (T. 20) (emphasis added). Finally, Dr. Eurenius's report references a "CT scan in 08/13." (T. 413). From all of this, it seems very likely that the CT scan to which Dr. Taddeo referred was actually performed on August 29, 2013, not August 29, 2003.

---

[12] The Court does not fault the ALJ in this regard, since Plaintiff's representative indicated that the record was complete, and the ALJ nevertheless left the record open following the hearing to allow Plaintiff to submit additional evidence.

Inexplicably, further information concerning this CT scan is missing from the record. Also missing are the office notes of the unnamed neurologist to whom Hartman referred Plaintiff in August 2013, who ordered the CT scan.[13] The Court believes that these omissions constitute a potentially-significant gap requiring further development of the record. *See, e.g., Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development of the evidence."). Moreover, due to the incomplete nature of the record at present, the Court cannot find that the ALJ's error at step two of the sequential analysis was harmless.

Finally, the Court notes that within the record and the ALJ's decision, there are references to shoulder pain, as well as "back pain" that may refer to either pain in the thoracic spine related to the brachial plexus injury, or pain in the lower back due to degenerative changes in the lumbo-sacral spine. It is not entirely clear to the Court how each of these conditions relate to the particular restrictions contained in Dr. Hartman's reports. Upon remand, the ALJ should endeavor to clarify the particular condition(s) which Dr. Hartman is claiming interfere with Plaintiff's ability to sit, stand, pay attention, work without taking breaks and maintain attendance.

---

[13] This clearly seems to have been a neurologist other than Dr. Taddeo. Indeed, it seems that Dr. Taddeo's first and only encounter with Plaintiff was on January 16, 2014, upon a referral from Dr. Stein. (T. 437).

CONCLUSION

Plaintiff's application for judgment on the pleadings [#8] is granted, and

Defendant's cross-motion [#11] is denied.  The matter is remanded to the

Commissioner for further administrative proceedings consistent with this Decision and

Order.

So Ordered.

Dated: Rochester, New York          ENTER:
         November  15, 2018

                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge